UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

SHIRLEY GIVENS, et al.,  :
         :  NO. 1:03-CV-00502
    Plaintiffs,  :
         :
         :
  v.       :
         :  **OPINION & ORDER**
         :
BUTLER METROPOLITAN HOUSING :
AUTHORITY       :
         :
    Defendant.  :


This matter is before the Court on the Plaintiffs' Motion for Partial Summary Judgment (doc. 33), the Defendant's Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment (doc. 35), the Plaintiffs' Reply Memorandum in Support of Its Motion for Partial Summary Judgment (doc. 40), Defendant's Sur-Reply in Opposition to Plaintiffs' Motion for Partial Summary Judgment (doc. 45), and Plaintiffs' Response to Defendant's Sur-Reply (doc. 47). Also before the Court are Plaintiffs' Objections, and Motion to Strike Affidavit of Joan Tumblison in Support of Defendant's Response to Plaintiffs' Motion for Partial Summary Judgment (doc. 38), Defendant's Response (doc. 44), and Plaintiffs' Reply (doc. 48). Finally, the Court considers Defendant's Motion for Summary Judgment (doc. 52), Plaintiffs' Response in Opposition (doc. 55), and Defendant's Reply (doc. 56). For the reasons indicated herein, the Court DENIES Plaintiffs'

Motion for Partial Summary Judgment, DENIES Plaintiffs' Motion to Strike, and DENIES IN PART AND GRANTS IN PART Defendant's Motion for Summary Judgment.

## I.  BACKGROUND

Bambo Harris Apartments ("Bambo Harris") is a 141-unit town-house style public housing project located in Hamilton, Ohio, which Defendant Butler Metropolitan Housing Authority ("BMHA") built in 1942, and later renovated in the 1970's and early 1980's (docs. 35, 40).  In addition to Bambo Harris, BMHA manages other public housing dwellings, including Riverside Apartments, which were built in 1958 and are located nearby Bambo Harris (Id.).  In total, BMHA operates some 3000 housing units (doc. 35).

Occupancy of Bambo Harris was at the 90% level through most of the 1990's (doc. 33).  According to Defendant, by 1999, it realized that significant upgrades and repairs were needed to extend the useful life of Bambo Harris, which had an inefficient heating system, problems with asbestos and lead paint, and overly narrow streets (Id.).  In late 1999, BMHA adopted a policy of not re-renting units in an effort to prepare for a future renovation or replacement of Bambo Harris (doc. 35).  According to Defendant, by August 2001, approximately 58% of the units were vacant through normal attrition and BMHA's non re-renting policy (Id.).

In August 2001, BMHA adopted a formal resolution to vacate, close, and demolish Bambo Harris (doc. 33).  At the time

2

the resolution was adopted, BMHA had not yet sought Department of Housing and Urban Development ("HUD") approval to carry out its decision to vacate and demolish Bambo Harris (doc. 33).  Also in August 2001, BMHA sent a notice to Bambo Harris residents informing them of the decision to replace the existing Bambo Harris units with new units called "Bambo Harris Estates" (doc. 33).  By this time eighty-three of the total 141 units were already boarded up and vacated (doc. 55).  In mid 2002, occupancy of Bambo Harris had declined to about seven families (doc. 35).  In 2004, BMHA applied to HUD for permission to demolish Bambo Harris, and HUD granted BMHA such permission in December of that year (doc. 33).  By early 2005, the remaining seven families at Bambo Harris had relocated to other housing, and Bambo Harris was vacant (doc. 35).  To date Bambo Harris remains vacant and boarded up (doc. 33).

From the years of 2000 through 2004, BMHA had obtained various cost estimates for either renovation or demolition of Bambo Harris.  In May 2000, BMHA estimated renovation cost for Bambo Harris was $8,369,564, or $59,000 per dwelling unit (doc. 33).  Later in 2004, this estimate was adjusted to $19 million (doc. 35).  Additionally, BMHA estimated the cost of demolition of Bambo Harris at $1.4 million (Id.).

HUD provided BMHA with $1.9 million annually between 1992 and 2001 for renovation of public housing as a part of HUD's Capital Fund program (docs. 33, 35).  BMHA used this Capital Fund

3

to maintain all of the public housing units it operates (Id.).  As an additional funding source, qualifying public housing authorities may apply to HUD for HOPE VI funds, although an award of such funds is not guaranteed (doc. 33).  BMHA did not apply for HOPE VI funding in years 2000, 2001, and 2002 (Id.).  Although unsuccessful, BMHA did apply for HOPE VI funding three times between 2003 and 2005 (doc. 35).  Other potential sources of funding for public housing authorities include government bonds and tax credits (Id.).

Plaintiffs, Shirley Givens, Laronda Ray, Amy Finkbone, and Mary Clemons, former residents of Bambo Harris, filed their Complaint in this matter on July 17, 2003, alleging BMHA violated federal public housing laws and its own written policies by closing Bambo Harris and failing to properly relocate the displaced residents.  Plaintiffs subsequently added the Bambo Harris/Riverside Resident Council as a Plaintiff (doc. 16).  Both Plaintiffs and Defendant have now moved this Court for summary judgment.

**II.  APPLICABLE LEGAL STANDARD**

Although a grant of summary judgment is not a substitute for trial, it is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a

4

judgment as a matter of law." Fed. R. Civ. P. 56; see also, e.g., Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464 (1962); LaPointe v. United Autoworkers Local 600, 8 F.3d 376, 378 (6th Cir. 1993); Osborn v. Ashland County Bd. of Alcohol, Drug Addiction and Mental Health Servs., 979 F.2d 1131, 1133 (6th Cir. 1992) (per curiam). In reviewing the instant motion, "this Court must determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Patton v. Bearden, 8 F.3d 343, 346 (6th Cir. 1993), quoting in part Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-252 (1986) (internal quotation marks omitted).

The process of moving for and evaluating a motion for summary judgment and the respective burdens it imposes upon the movant and the non-movant are well settled. First, "a party seeking summary judgment ... bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact [.]" Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see also LaPointe, 8 F.3d at 378; Guarino v. Brookfield Township Trustees, 980 F.2d 399, 405 (6th Cir. 1992); Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989). The movant may do so by merely identifying that the non-moving party lacks evidence to

5

support an essential element of its case.  See Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A., 12 F.3d 1382, 1389 (6th Cir. 1993).

Faced with such a motion, the non-movant, after completion of sufficient discovery, must submit evidence in support of any material element of a claim or defense at issue in the motion on which it would bear the burden of proof at trial, even if the moving party has not submitted evidence to negate the existence of that material fact.  See Celotex, 477 U.S. at 317; Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).  As the "requirement [of the Rule] is that there be no genuine issue of material fact," an "alleged factual dispute between the parties" as to some ancillary matter "will not defeat an otherwise properly supported motion for summary judgment."  Anderson, 477 U.S. at 247-248 (emphasis added); see generally Booker v. Brown & Williamson Tobacco Co., Inc., 879 F.2d 1304, 1310 (6th Cir. 1989).  Furthermore, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]."  Anderson, 477 U.S. at 252; see also Gregory v. Hunt, 24 F.3d 781, 784 (6th Cir. 1994).  Accordingly, the non-movant must present "significant probative evidence" demonstrating that "there is [more than] some metaphysical doubt as to the material facts" to survive summary judgment and proceed to trial on the merits.  Moore v.

<u>Philip Morris Cos., Inc.</u>, 8 F.3d 335, 339-340 (6th Cir. 1993); <u>see also</u> <u>Celotex</u>, 477 U.S. at 324; <u>Guarino</u>, 980 F.2d at 405.

Although the non-movant need not cite specific page numbers of the record in support of its claims or defenses, "the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the non-moving party relies." <u>Guarino</u>, 980 F.2d at 405, <u>quoting</u> <u>Inter-Royal Corp. v. Sponseller</u>, 889 F.2d 108, 111 (6th Cir. 1989) (internal quotation marks omitted). In contrast, mere conclusory allegations are patently insufficient to defeat a motion for summary judgment. <u>See</u> <u>McDonald v. Union Camp Corp.</u>, 898 F.2d 1155, 1162 (6th Cir. 1990). The Court must view all submitted evidence, facts, and reasonable inferences in a light most favorable to the non-moving party. <u>See</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986); <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144 (1970); <u>United States v. Diebold, Inc.</u>, 369 U.S. 654 (1962). Furthermore, the district court may not weigh evidence or assess the credibility of witnesses in deciding the motion. <u>See</u> <u>Adams v. Metiva</u>, 31 F.3d 375, 378 (6th Cir. 1994).

Ultimately, the movant bears the burden of demonstrating that no material facts are in dispute. <u>See</u> <u>Matsushita</u>, 475 U.S. at 587. The fact that the non-moving party fails to respond to the motion does not lessen the burden on either the moving party or the Court to demonstrate that summary judgment is appropriate. <u>See</u>

7

<u>Guarino</u>, 980 F.2d at 410; <u>Carver v. Bunch</u>, 946 F.2d 451, 454-455 (6th Cir. 1991).

## III.  ANALYSIS

Congress amended the United States Housing Act in 1987 so as to explicitly allow for a private right of action for tenants. <u>Velez v. Cisneros</u>, 850 F. Supp. 1257, 1270 (E.D. Pa 1994). Plaintiffs therefore have standing to bring their Complaint, which essentially presents two claims that allege violation of federal public housing laws.  First Plaintiffs contend that BMHA's actions in closing Bambo Harris constitute a de facto demolition of housing facility without HUD approval in violation of the United States Housing Act, 42 U.S.C. § 1437p, and 24 C.F.R. 970.12 (doc. 33). Second, Plaintiffs allege that BMHA withheld relocation assistance from Bambo Harris residents in violation of the United States Housing Act, 42 U.S.C. § 1437p; the Uniform Relocation Assistance and Real Property Acquisition Policies Act, 42 U.S.C. § 4601 <u>et seq</u>; and BMHA's Resident Relocation Assistance Plan (<u>Id</u>.).  Before addressing the parties' arguments in support of their respective motions for summary judgment, the Court will first address Plaintiffs' Motion to Strike.

## A.  Plaintiffs' Motion to Strike

Plaintiffs move the Court to strike portions of the affidavit of Joan Tumblison, proffered by Defendant in response to Plaintiffs' motion for summary judgment (doc. 38).   Tumblison

8

served as BMHA's Assistant Director and counsel, from 2001 until 2006. Plaintiffs argue that Tumblison does not have personal knowledge about events previous to her employment, and therefore portions of her affidavit are hearsay and irrelevant (doc. 38). Plaintiffs further argue that other portions of Tumblison's affidavit do pertain to events after she came to work for Defendant, but are based on things people told her or documents not in the record (Id.). These statements, argue Plaintiffs, are also inadmissible hearsay (Id.). Finally, Plaintiffs argue that Tumblison's affidavit includes a number of conclusory statements, including that Defendant did not have the money to make repairs, and that it forced no tenant to move (Id.) Finally, Plaintiffs argue statements regarding the measure of damages simply are not relevant, as its motion is for partial summary judgment on liability (Id.).

Defendant responds, citing AGI Realty Group, Inc. v. Red Robin Intern., Inc., No. 94-3911, 1996 U.S. App. LEXIS 10122, * 10-11 (6th Cir., March 28, 1996), for the proposition that "[c]orporate officers are considered to have personal knowledge of the acts of their corporations and an affidavit setting forth those facts is sufficient for summary judgment" (doc. 44). Defendant argues the same principal applies to management-level employees in government agencies (Id. citing State of New York v. Saint Francis Hospital, 94 F. Supp. 2d 423, 425-26 (S.D.N.Y. 2000)). Accordingly, argues

9

Defendant, no portion of Tumblison's affidavit should be stricken under Plaintiffs' theory that it contains or is based upon hearsay (<u>Id</u>.).  Defendant argues that if any of Tumblison's statements are deemed conclusory, then most of Plaintiffs' assertions should be as well, and should be stricken (<u>Id</u>.).  Finally, Defendant argues that statements regarding damages are relevant to whether any remedy can be fashioned (<u>Id</u>.).

       Having reviewed the parties' arguments, and the affidavit of Tumblison, the Court concludes that as BMHA's assistant director, Tumblison was able to speak on behalf of the agency.  The contents of her affidavit pertain to issues that clearly she had to handle within the scope of her employment.  Accordingly, she gained first-hand knowledge, and for purposes of summary judgment, such an affidavit is admissible. <u>AGI Realty Group, Inc. v. Red Robin Intern., Inc.</u>, No. 94-3911, 1996 U.S. App. LEXIS 10122, * 10-11 (6th Cir., March 28, 1996).  As for Plaintiffs' argument that certain of Tumblison's statements are conclusory, the Court will not mistake advocacy for assertions of fact.  Finally, the Court finds statements about damages relevant because subsequent to the filing of Plaintiffs' motion to strike, Defendant filed a motion for summary judgment on all claims made by Plaintiffs.  Defendant is entitled to proffer such statements in support of the theories in its motion.  For all of these reasons, the Court denies Plaintiffs' Motion to Strike.

**B. Plaintiffs' Claim of De Facto Demolition**

Defendant argues that Plaintiffs' de facto demolition claim is moot because of HUD's later approval of demolition; and in any event, its actions constituted a consolidation, which is permissible under the law. Therefore, the primary issue regarding Plaintiffs' first claim is whether, under 42 U.S.C. § 1437p, BMHA's actions constituted illegal de facto demolition of Bambo Harris or a lawful consolidation. The secondary issue is, should BMHA's actions amount to de facto demolition of Bambo Harris, whether a subsequent approval of demolition by HUD render an earlier de facto demolition moot.

The purpose of Title 42 U.S.C. § 1437p is to preserve the number of available public housing units. Velez v. Cisneros, 850 F.Supp. 1257, 1270 (E.D.Pa. 1994). As such, it provides for an application process that housing authorities must follow prior to the demolition or disposition of public housing. Section 1437p(a)(1)-(6) delineates the certification requirements a public housing agency must meet so as to gain the Secretary's approval for demolition or disposition. In order to gain approval to demolish public housing, a housing agency must certify that "the project or portion of the public housing project is obsolete as to physical condition, location or other factors," and that "no reasonable program of modifications is cost-effective" so as to bring the project back to useful life. 42 U.S.C. 1437p(a)(1)(A)(i-ii).

11

Where an agency proposes to demolish only a portion of a project, it must further certify that "the demolition will help to ensure the viability of the remaining portion of the project." 42 U.S.C. 1437p(a)(1)(B). The statute further contemplates that the agency must specifically authorize the demolition in its public housing agency plan, that each resident family should receive notification of the demolition, that the agency will relocate each resident family to comparable housing, relocation expenses will be covered, and the agency will provide any necessary counseling for residents who are displaced. 42 U.S.C. 1437p(a)(4). The statute is clear that no demolition can begin until all residents are relocated. 42 U.S.C. 1437p(a)(4)(E).

The Secretary is directed to disapprove of applications if the Secretary determines that the certification of the housing agency is inconsistent with information and data available to the Secretary, or if the application was not developed in consultation with the residents, any resident council, and appropriate government officials. 42 U.S.C. 1437p(b). Of particular importance to this case, Congress amended the statute in 1995, so as to permit "consolidation of occupancy within or among buildings." 42 U.S.C. 1437p(e). The amendment directs that:

> Nothing in this section may be construed to prevent a public housing agency from consolidating occupancy within or among buildings of a public housing project, or among projects, or with other housing for the purpose of improving living conditions of, or providing more efficient services to, residents.

12

Id.  A housing agency is also permitted to forgo the application process for demolition, in the case where over a five-year period it demolishes the lesser of five dwelling units or five percent of the total dwelling units owned by the agency, so long as the space occupied by the demolished unit is used for meeting the needs of residents, or the unit was beyond repair.  42 U.S.C. 1437p(f). Finally, also pertinent to Plaintiffs' claims before the Court, the statute indicates that the Uniform Relocation and Real Property Acquisition Act is inapplicable to activities under this section. 42 U.S.C. 1437p(g).

In addition to the statutory scheme, Title 24 C.F.R. § 970.12 addresses the required and permitted actions of a public housing authority prior to any approval by the Secretary of HUD for demolition and disposition of public housing.  It states:

> A PHA may not take any action to demolish or dispose of a public housing project or a portion of a public housing project without obtaining HUD approval under this part. Until such time as HUD approval may be obtained, the PHA shall continue to meet its ACC [Annual Contributions Contract] obligations to maintain and operate the property as housing for low-income families.  This does not, however, mean that HUD approval under this part is required for planning activities, analysis, or consultations, such as project viability studies, comprehensive modernization planning or comprehensive occupancy planning.

24 C.F.R. § 970.12.

Based on 42 U.S.C. § 1437p and 24 C.F.R. § 970.12, it is evident that a public housing authority cannot demolish public housing units, beyond the de minimis exception under § 1437p(f),

13

without first obtaining the approval of the HUD Secretary. However, a public housing authority is clearly permitted to consolidate occupancy without seeking HUD approval. Under Section 1437p(e), the only requirement for consolidation is that the consolidation be "for the purpose of improving living conditions of, or providing more efficient services to, residents."

An example of permissible consolidation is seen in English Woods Civic Ass'n/Resident Community Council v. Cincinnati Metro. Hous. Autho., 2004 U.S. Dist. LEXIS 26389 (S.D. Ohio). In English Woods, a membership organization of the English Woods housing community sued the Cincinnati Metropolitan Housing Authority (hereinafter "CMHA") for de facto demolition. 2004 U.S. Dist. LEXIS 26389 at *2. CMHA denied the charge of de facto demolition and argued that it had engaged in a permissible consolidation plan under 42 U.S.C. § 1437p(e). Id.

The facts showed that the English Woods housing project needed renovation, and CMHA had obtained an estimate for the necessary work in excess of $89 million. Id. at *7. When it became clear that CMHA would not qualify for HOPE VI funding, CMHA applied to HUD for approval to demolish English Woods. Id. at *15. HUD later denied CMHA's application for demolition, upon which CMHA began consolidating occupancy. Id. at *17. In so doing, CMHA brought residents together so as to close off vacant areas, and concentrate residents in the best buildings, where there was more

14

reliable hot water and heat.  Id. at *18-19.  As a result, the
Court found the residents experienced improved security and
improved reliability of heat and water services.  Id.  In agreeing
that CMHA's occupancy consolidation resulted in improved living
conditions and the provision of more efficient services, the
English Woods court stated:

> The language of § 1437p is plain. When a housing
> authority implements a consolidation of residents to
> improve living conditions or efficiency, as here, the
> consolidation does not violate the demolition provisions,
> even though a consolidation necessarily includes the
> closing off of vacant units or areas.

Id. at *31.

### 1.   Defendant Argues It Consolidated at Bambo Harris

In this case, BMHA argues that its actions in vacating
Bambo Harris amounted to permissible occupancy consolidation, not
de facto demolition.  BMHA supports its argument in three ways.
First BMHA argues that Congress's 1995 amendment to 42 U.S.C. §
1437p, adding the occupancy consolidation provision in subsection
(e), removed any basis for finding de facto demolition (doc. 35).
Second, BMHA argues that the facts in this case do not support a
finding of de facto demolition based on prior case law (Id.).
Third, BMHA argues that its actions improved the living conditions
and efficiency of provided services as required by any lawful
occupancy consolidation under Section 1437p(e) (Id.).

As for BMHA's first argument, the Court does not find
well-taken the position that Congress's 1995 amendments adding the

15

consolidation provisions eliminated any possible claims for de facto demolition.   Congress neither repealed the application process, nor the need for the Secretary's approval prior to demolition.   The statute on its face contains de minimus exceptions allowing for demolition outside of the normal application procedures.  42 U.S.C. 1437p(f).  Should an agency's actions fall outside both the normal application procedures and the de minimus exception, and should the action not be found to constitute a consolidation within the meaning of the statute, displaced residents could certainly have a complaint for de facto demolition where their housing has been rendered unusable by a housing authority's action or inaction.

     BMHA's second rationale is that there can be no de facto demolition unless the units in question meet the standards in 42 U.S.C. §1437p(a)(1)(A), that is, that the units are "(1) obsolete or unusable for housing purposes, or (2) there is no reasonable cost-effective program to return the units to a useful life" (doc. 35).  According to Defendant, the case law used by Plaintiffs in support of their case shows a finding of de facto demolition only where the housing authority allowed the units to become uninhabitable and unsafe, thereby making the units obsolete or unusable for housing purposes.  (doc. 35, citing Velez, 850 F. Supp. 1257, Henry Horner Mothers Guild v. Chicago Hous. Auth., 780 F. Supp. 511 (N.D. Ill. 1991), Tinsley v. Kemp, 750 F. Supp. 1001

16

(W.D. Mo. 1990), <u>Concerned Tenants Ass'n of Father Panik Village v. Pierce</u>, 685 F. Supp. 316 (D. Conn. 1988)).  In these cases, argues Defendant, the housing developments had become unsanitary from years of neglect, and "[u]nits had been taken over by drug addicts and drug dealers, as well as other sorts of vermin and insects" (doc. 35).  In contrast here, argues Defendant, the record shows Plaintiffs found Bambo Harris to be a good place to live, testimony that stands in stark contrast to any finding that Bambo Harris meets the obsolescence requirement.  Moreover, argues Defendant, HUD regulations define "demolition" in terms of "razing," evidence of which is lacking in this case (doc. 45).

The Court rejects Defendant's second argument.  The record shows that under BMHA's own analysis, it found that "significant upgrades and repairs were needed in order to extend the useful life of Bambo Harris" (doc. 35).  BMHA argues that Plaintiffs have failed to show the units are obsolete and unusable, yet when BMHA applied to HUD for demolition, BMHA claimed that the Bambo Harris units were beyond repair at an estimated cost of $19 million.  Moreover, the fact that Plaintiffs previously found the project to be a good place to live does not contradict Plaintiffs' argument that Defendant's alleged inaction in maintaining the property, and Defendant's actions in boarding it all up and vacating it, has rendered the units unusable.  "Housing units may become unusable for housing for reasons other than 'razing.'"

17

<u>Velez</u>, 850 F.Supp. 1257, 1271.  Contrary to Defendant's opinion, demolition may be found where a housing authority adopts a policy allowing units to remain vacant after their occupants' departure. <u>Id</u>. at 1276.

BMHA's third argument is that its actions constituted occupancy consolidation because its actions resulted in improved safety and living conditions, and the ability to provide services more efficiently for displaced residents.  Specifically, Defendant proffers evidence that "[c]eilings were falling down in some units exposing asbestos and lead."  Defendant also argues it was inefficient to provide services, particularly heat and hot water, at Bambo Harris.

Plaintiffs' affidavits, however, tell a different story. Laronda Ray indicated she was moved to Riverside, where there was a bad environment, drug deals, and even a shoot out that endangered children.  Amy Finkbone stated since the relocation, she and her family "have lived in worse housing in a worse neighborhood."  Mary Clemons indicated she tried to delay her move to Riverside for as long as possible, citing crime and overcrowding.  All three affiants indicated they either enjoyed living at Bambo Harris, they liked what they had, or that Bambo Harris was a good place to live until it was vacated, boarded up, and became a blight.

**2. The Evidence About Consolidation Must Be Weighed By A Jury**

Both sides present different sorts of evidence in support

18

of their positions concerning whether Defendant's actions constituted consolidation. However, as such facts must be weighed so as to make a final determination on the consolidation question, summary judgment is inappropriate for either side in this matter. Adams v. Metiva, 31 F.3d 375, 378 (6th Cir. 1994).

Plaintiffs cannot prevail on summary judgment because Defendant raised a genuine issue of material fact as to whether the tenants' move resulted in improved living conditions or increased efficiency in the delivery of services. A reasonable jury might find, in weighing all the evidence, that despite Plaintiffs' complaints about safety and security, Defendant's proffered evidence about asbestos, leaded paint, and inefficient utilities show that on balance, living conditions improved for the displaced Plaintiffs or that greater efficiency resulted. Of course, in order to reach that conclusion, the jury would have to make the inference that Riverside constituted an improvement over Bambo Harris either as to living conditions or as to efficiency. A jury would also have to conclude that the security issues cited by Plaintiffs are outweighed by Defendant's evidence.

On the other hand, Defendant cannot prevail on summary judgment because although it raised the argument that the move to Riverside resulted in a greater efficiency in the delivery of services, it proffered no hard evidence to support that

19

proposition.[1]  It proffered facts about how bad and inefficient the utilities at Bambo Harris were, but failed to proffer specific evidence showing how Riverside was any better.  Because the record is currently devoid of evidence showing that Plaintiffs were actually threatened by the conditions cited by Defendant, that the conditions were pervasive and urgent enough to justify the evacuation of Bambo Harris, or that Riverside does not pose similar health risks, a jury could find on balance that the facts do not add up to better living conditions or increased efficiency for the displaced tenants.  <u>Velez</u>, 850 F.Supp. 1257, 1266-67 ("There was no evidence of large amounts of flaking or peeling lead-based paint or large numbers of children with elevated blood lead levels; on this record, it would not be necessary to move people out of units containing lead-based paint forthwith. . . .Although there was asbestos. . .only a small amount was present in residential areas. . . was not friable; the small amount of potentially friable asbestos on the ceilings of units at Chester Towers did not pose an immediate danger to residents").  Moreover, Defendant offered no evidence to dispute Plaintiffs' concerns about increased crime and decreased safety at Riverside, issues that the Court finds are fundamentally related to the living conditions of the tenants.  In <u>English Woods</u>, the Court found that security for the residents

---

[1]Tumblison's affidavit merely states "Consolidation improved safety and enabled BMHA to provide services more efficiently."

improved thanks to the actions of the housing agency.  2004 U.S. Dist. LEXIS 26398, at *19.  Here, Plaintiffs' affidavits show the opposite effect.

### 3. Defendant Argues Even If Its Actions Do Not Constitute Consolidation, HUD's Subsequent Approval Moots Plaintiffs' Claim For De Facto Demolition

The Court further finds unpersuasive Defendant's reliance on HUD's 2004 approval of its application for demolition in support of its theory that Plaintiffs' claims are now moot.  Such approval came more than three years after Defendant advised Bambo Harris residents they needed to relocate, and some five years after Defendant started emptying the housing project.  It is during this five-year time period that Plaintiffs allege Defendant abandoned the facility, let it deteriorate, and forced tenants to move.  In November 2002, a HUD assessment of Bambo Harris noted that "BMHA has not initiated an appropriate demolition or disposition application. . .for Bambo Harris," and the "apparent abandonment of the property site will be problematic for future management certifications, operating budget subsidy calculations..." (doc. 34).  When HUD itself noted that BMHA was not following Section 1437p, and that BMHA had apparently abandoned Bambo Harris, it does not follow that HUD's eventual approval of demolition would somehow justify or remedy Defendant's alleged past inaction.  Obviously, where a de facto demolition has occurred, HUD would be left with little choice in the end but to approve demolition.

21

In summary, the Court finds a genuine issue as to whether a bona fide occupancy consolidation occurred in this case.  There are facts that support the theories of both sides, and it is for a jury to consider, weigh, and make the final determination.  Should a jury find on balance that living conditions improved for residents, or that an increased efficiency in the delivery of services resulted, then Defendant will prevail as its actions amounted to a permissible consolidation.  Should a jury find that no real improvement or increased efficiency resulted from Defendant's actions, then Defendant could be liable for the de facto demolition of Bambo Harris.

**C. Plaintiffs' Claim For Relocation Assistance Against BMHA**

Plaintiffs also claim that BMHA denied its displaced residents entitled relocation benefits under 42 U.S.C. § 1437p, the Uniform Relocation Assistance and Real Property Acquisition Policies Act, 42 U.S.C. § 4601 et seq; and BMHA's Resident Relocation Assistance Plan.  Because this case clearly falls under Section 1437, Plaintiffs' alternative pleading under the Uniform Relocation and Real Property Acquisition Act is inapplicable here. 42 U.S.C. 1437p(g).

Sections 1437p requires a housing authority demolishing units to provide for "the payment of actual and reasonable relocation expenses of each resident," as well as for "counseling for residents who are displaced."  42 U.S.C. §§ 1437p(a)(4)(B), and

(D). The Defendant's Relocation Assistance Plan similarly provides for payment or reimbursement of moving expenses and incidental costs.

Plaintiffs' affidavits indicate Defendant covered the costs of moving trucks, but state Plaintiffs would have preferred vouchers for other housing. Plaintiffs' briefing indicates that Defendant must offer a range of services in relocating displaced tenants, but only provided trucks.

Tumblison's affidavit indicates that prior to the relocation, "[t]enants were advised relocation assistance would be provided, including the cost of moving and for relocating utilities such as cable and telephone. Tenants were also advised that if they had any additional moving or relocation needs or expenses they had to ask BMHA for assistance." Defendant argues that it reimbursed every expense submitted by Plaintiffs, and even indicates that should Plaintiffs have submitted other relocation expense reimbursements, "BMHA would have paid it and would probably pay it now" (doc. 56).

Plaintiffs have not disputed the fact that they were advised they were entitled to relocation assistance, nor that they were advised to ask for it. Under these circumstances, the Court cannot hold Defendant liable for failing to reimburse Plaintiffs for claims that Plaintiffs never submitted. Accordingly, the Court grants summary judgment to Defendant on Plaintiffs' claims for

relocation assistance reimbursement under Section 1437p and the Relocation Assistance Plan. The Court further takes in good faith Defendant's representation that it would probably pay relocation expense benefits if Plaintiffs would submit them now, and encourages it to reimburse any reasonable relocation expense requests accordingly.

Plaintiffs' core complaint here, as reflected in their affidavits, is that when asked to move, they would have preferred to have options other than Riverside, through the issuance of housing vouchers. The relocation provisions require the provision of "comparable housing," which may be accomplished through a number of means, including vouchers. 42 U.S.C. 1437p(a)(4)(A)(iii). There is no requirement that a housing authority provide housing vouchers, only that its actions result in comparable housing.

The Court concludes that even should a jury's factual findings support the legal conclusion that Defendant consolidated the Bambo Harris housing project, there still may be a question as to whether Riverside qualified as comparable housing. It could be, for example, that a jury might conclude the relocation to Riverside resulted in greater efficiency in the provision of certain utilities, but that the housing in Riverside is "located in an area" generally "less desirable" than that of Bambo Harris. 42 U.S.C. 1437p(a)(4)(A)(iii)(II). Although Tumblison's affidavit states that the "tenants were given a choice of comparable

24

replacement housing," such statement stands in contrast to the affidavits of tenants indicating Riverside was worse. For this reason, the Court cannot grant summary judgment for Defendant as to Plaintiffs' claims for relocation to comparable housing.

**IV. CONCLUSION**

Having reviewed this matter, the Court finds genuine questions as to whether the actions of Defendant in moving Plaintiffs from their housing at Bambo Harris to Riverside and closing Bambo Harris amounted to a de facto demolition or a consolidation. As a reasonable jury could find facts in support of either party's position, it is inappropriate for the Court to grant summary judgment to either side in this dispute.

However, the Court finds no genuine dispute as to the fact that residents were advised as to their right to request reimbursement for relocation costs, and that they simply did not do so. For this reason, the Court grants summary judgment, in part, to Defendant on Plaintiffs' claims for reimbursement of relocation expenses. Finally, the Court finds a genuine issue as to whether Riverside constituted "comparable housing" within the meaning of the Housing Act, which precludes summary judgment for either party on the question of whether Defendant is liable for relocating Plaintiffs to housing at the Riverside housing project.

For the reasons indicated herein, the Court DENIES Plaintiffs' Motion for Partial Summary Judgment (doc. 33), DENIES

25

Plaintiffs' Motion to Strike (doc. 38), and DENIES IN PART Defendant's Motion for Summary Judgment, but GRANTS IN PART such Motion to the extent that it dismisses Plaintiffs' Claims for relocation assistance reimbursement (doc. 52).

     SO ORDERED.

Dated: December 19, 2006    /s/ S. Arthur Spiegel

                              S. Arthur Spiegel

                              United States Senior District Judge